Case 2:00-cv-00093   Document 13   Filed in TXSD on 06/29/2000   Page 1 of 40

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
F:LED

JUN 2 9 2000

Michael N. Milby, Clerk

| | | |
|---|---|---|
| LOIS JEAN CAGE | § | |
| | § | |
| v. | § | CIVIL ACTION NO. C-00-093 |
| | § | |
| MADELINE E. BONNER, | § | |
| THE ESTATE OF SAMUEL BONNER | § | |
| AND REYNOLDS METALS COMPANY | § | |

## DEFENDANT REYNOLDS METALS COMPANY'S SECOND
## MOTION FOR SUMMARY JUDGMENT WITH SUPPORTING AUTHORITIES

Now comes Defendant, Reynolds Metals Company ("Reynolds Metals"), and, pursuant to Rule 56, Fed. R. Civ. P., respectfully moves the Court to enter summary judgment in its favor on the ground that there is no genuine issue of material fact and Reynolds Metals is entitled to judgment as a matter of law. Reynolds Metals previously filed a motion for summary judgment, which was denied without prejudice by the Court on May 30, 2000. On that same date, the Court ordered the parties to file cross-motions for summary judgment on or before June 29, 2000. In support of its second motion, Reynolds Metals shows the following:

### PRELIMINARY STATEMENT

This is an action by Plaintiff Lois Jean Cage, former wife of Samuel Bonner, to recover a community property share of Mr. Bonner's retirement benefits which accrued during his employment with Reynolds Metals. Specifically, Ms. Cage alleges that pursuant to an Agreement Incident to Divorce incorporated into the 1975 divorce decree dissolving the marriage of Ms. Cage and Mr. Bonner, she is entitled to a community property share of Mr. Bonner's retirement benefits based on their nineteen years of marriage.

JETEJK\9C2525\000118
SAN ANTONIO\512966.1

As demonstrated below, Reynolds Metals is entitled to summary judgment on Ms. Cage's claim. Although not cited in Ms. Cage's First Original Petition, the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, governs resolution of Ms. Cage's claim. The United States Supreme Court has held that ERISA defines the scope of a non-participant spouse's community property interest in pension plans and that it preempts state community property laws that conflict with ERISA provisions and objectives. Under ERISA, Ms. Cage's claim for a share of Mr. Bonner's retirement benefits, which he received in the form of a joint and survivor annuity, fails because no qualified domestic relations order ("QDRO") exists assigning a share of Mr. Bonner's retirement benefits to Ms. Cage. Therefore, ERISA's anti-alienation provision defeats Ms. Cage's claim to a share of those benefits. Furthermore, the survivor's annuity vested in Mr. Bonner's current wife, Madeline Bonner, on the date Mr. Bonner retired. Since no QDRO designating Ms. Cage as Mr. Bonner's surviving spouse was issued prior to Mr. Bonner's retirement in 1992, Ms. Cage is not entitled to any part of the survivor's annuity.

## STIPULATED FACTS

At the scheduling conference on May 30, 2000, the Court instructed the parties to prepare stipulated facts in connection with their cross-motions for summary judgment. Plaintiff Lois Jean Cage's and Reynolds Metals Company's Stipulated Facts is being filed concurrently with this motion. In addition, for the Court's convenience, a copy of the Stipulated Facts is attached to this Motion under Tab 1.[1]

---

[1] Reynolds Metals' summary judgment evidence consisting of the Affidavit of Ellen M. Dixon ("Dixon Aff.") with exhibits, is attached to its Second Motion for Summary Judgment under Tab 2.

## ARGUMENT

**I.    Ms. Cage's Claim for Benefits Under the Pension Plan Is Governed by ERISA.**

ERISA applies to employee benefit plans, including pension plans, "established by or maintained by an employer" engaged in interstate commerce. *Meredith v. Time Ins. Co.*, 980 F.2d 352, 354 (5th Cir. 1993) (citing 29 U.S.C. § 1003(a)). A "pension plan" is defined as:

> any plan, fund, or program . . . established or maintained by an employer . . . to the extent that by its express terms . . . such plan, fund or program—
>
> (i)    provides retirement income to employees, or
>
> (ii)   results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .

29 U.S.C. § 1002(2)(A). The Reynolds Metals Company Pension Plan for Hourly Employees (Plan 013) is an ERISA-covered plan. Dixon Aff. ¶ 2 and Ex. A.

ERISA contains an express preemption clause which states that the Act "shall supersede any and all State laws insofar as they may now or hereafter relate to an employee benefit plan . . . ." 29 U.S.C. § 1144(a). *See also Boggs v. Boggs*, 117 S. Ct. 1754, 1761 (1997) (quoting statute). "'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c). Furthermore, the words "relate to" are construed in their broadest sense. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98, 103 S. Ct. 2890, 2900 (1983); *Dial v. NFL Player Supplemental Disability Plan*, 174 F.3d 606, 610 (5th Cir. 1999); *Vega v. National Life Ins. Servs., Inc.*, 145 F.3d 673, 675 (5th Cir. 1998), *adhered to en banc*, 188 F.3d 287 (5th Cir. 1999). "[A] state law 'relates to' an employee benefit plan, and is preempted by ERISA, 'if it has a connection with, or reference to, such a plan.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S. Ct. 2031, 2037 (1992).

The Supreme Court has held that ERISA preempts state community property laws that conflict with ERISA provisions and objectives.[2] *Boggs*, 117 S. Ct. at 1762. *See also Rivers v. Central & South West Corp.*, 186 F.3d 681, 683 (5th Cir. 1999) (stating that plaintiff's state law claim for community property share of former husband's pension was preempted by ERISA and denying benefits to plaintiff because she failed to protect her right to pension benefits by complying with ERISA requirements); *Schlesinger v. Johnson*, No. 99-1416 Section "G", 1999 U.S. Dist. Lexis 17063 at *8 (E.D. La. 1999) (noting that ERISA preempts state community property laws and denying plaintiff's claim for pension benefits based on community property interest in former husband's pension, where QDRO obtained by plaintiff in 1992, 18 years after divorce, only granted plaintiff share of benefits during former husband's life; therefore, plaintiff not entitled to any benefits after former husband's death in 1993).

---

[2] The Supreme Court has opined in a case involving analogous circumstances:

> Notwithstanding the limited application of federal law in the field of domestic relations generally, (citations omitted), this Court, even in that area, has not hesitated to protect, under the Supremacy Clause, rights and expectancies established by federal law against the operation of state law, or to prevent the frustration and erosion of the congressional policy embodied in the federal rights. (Citations omitted) . . . [A] state divorce decree, like other laws governing the economic aspects of domestic relations, must give way to clearly conflicting federal enactments. (Citations omitted). That principle is but the necessary consequence of the Supremacy Clause of our National Constitution.

*Ridgway v. Ridgway*, 454 U.S. 46, 54-55, 102 S. Ct. 49, 54 (1981) (holding that federal law giving member of armed services sole right to designate beneficiary of insurance policy took precedence over California divorce decree requiring former husband to maintain insurance for benefit of children). *See also McCarty v. McCarty*, 453 U.S. 210, 232-35, 101 S. Ct. 2728, 2741-42 (1981) (federal law precludes state court from dividing retired military pay pursuant to state community property laws).

Furthermore, a suit by a participant or beneficiary to recover benefits from a covered plan falls directly within the civil enforcement provision of ERISA, which provides an exclusive federal cause of action for the resolution of such disputes. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62-63, 107 S. Ct. 1542, 1546 (1987). *See also Vega*, 145 F.3d at 675 ("A state law claim addressing the right to receive benefits under the terms of an ERISA plan necessarily relates to an ERISA plan" and is subject to ERISA preemption). "In short, when beneficiaries seek to recover benefits from a plan covered by ERISA, their exclusive remedy is provided by ERISA, in 29 U.S.C. § 1132(a)(1)(B)." *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 979 (5th Cir. 1991).[3]

Here, Ms. Cage has sued Reynolds Metals (employer and Pension Plan administrator), the Estate of Samuel Bonner (Pension Plan participant), and Madeline Bonner (Pension Plan beneficiary), alleging that she is entitled to Pension Plan benefits. This action, therefore, relates to a pension plan. *Dial*, 174 F.3d at 611; *Hansen*, 940 F.2d at 979. Accordingly, Ms. Cage's action to recover benefits from a covered plan, initially filed in state court, and based on a state court order dividing the marital property of Ms. Cage and Mr. Bonner, is preempted by ERISA. *Boggs*, 117 S. Ct. at 1762, 1767; *Rivers*, 186 F.3d at 683; *Dial*, 174 F.3d at 611; *Hansen*, 940 F.2d at 979. Reynolds Metals timely removed this case to federal court on the basis of ERISA preemption.

---

[3] As a former wife of Mr. Bonner, Ms. Cage is considered to be a beneficiary for purposes of asserting her claim to a share of Mr. Bonner's benefits. *See Boggs*, 117 S. Ct. at 1763.

## II.   Reynolds Metals Is Entitled to Summary Judgment Because Ms. Cage Has No Enforceable Right to a Share of Mr. Bonner's Retirement Benefits.

ERISA was enacted for the purpose of protecting and ensuring "the continued well-being and security of millions of employees and their dependents who rely upon retirement plans." *Ablamis v. Roper*, 937 F.2d 1450, 1453 (9th Cir. 1991). Thus, ERISA contains a spendthrift or anti-alienation provision which states that benefits provided under covered retirement pension plans may not be alienated or assigned. 29 U.S.C. § 1056(d)(1). Notably, prior to 1984, ERISA did not clearly delineate a spouse's interest in an employee's pension benefits. *Ablamis*, 937 F.2d at 1453. Congress, therefore, enacted the Retirement Equity Act of 1984 ("REA") primarily for the purpose of safeguarding the financial security of widows and divorcees. *Id.*

The REA creates an express statutory exception to the anti-alienation provision; specifically, the anti-alienation provision does not apply to "qualified domestic relations orders" ("QDRO").[4] 29 U.S.C. § 1056(d)(3)(A). Under the REA, a court may divide the rights of spouses in pension benefits through a QDRO and award the non-employee spouse her proper share of those benefits. *Id.* § 1056(d)(3)(A). A "domestic relations order" is

> any judgment, decree or order (including approval of a property settlement agreement) which—
>
> > (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

---

[4] The Fifth Circuit has noted that the REA "creat[ed] a new procedure - unique and exclusive to ERISA - for obtaining otherwise prohibited assignments or alternations of pension plan benefits in the event of, inter alia, divorce," i.e., the TDRO. *Dorn v. IBEW*, 211 F.3d. 938, 941 (5th Cir. 2000).

(II) is made pursuant to a state domestic relations law
(including a community property law).

29 U.S.C. § 1056(d)(3)(B)(ii)(I) and (II). A domestic relations order is a QDRO if it "creates or

recognizes the existence of an alternate payee's right to . . . receive all or a portion of the benefits

payable with respect to a participant under a plan" and meets certain additional statutory

requirements. 29 U.S.C. § 1056(d)(3)(B)(i)(I). Thus, to qualify as a QDRO, the court order must

also include: (1) the name and the last known mailing address (if any) of the participant and the

name and mailing address of each alternate payee covered by the order; (2) the amount or percentage

of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in

which such amount or percentage is to be determined; (3) the number of payments or period to which

such order applies, and (4) each plan to which such order applies. *Id.* § 1056(d)(3)(C).

The statute also includes three general prohibitions for a QDRO—the court order may not

(1) require a plan to provide any type or form of benefit, or any option, not otherwise provided under

the plan, (2) require the plan to provide increased benefits (determined on the basis of actuarial

value), or (3) require the payment of benefits to an alternate payee which are required to be paid to

another alternate payee under another order previously determined to be a qualified domestic

relations order. *Id.* § 1056(d)(3)(D).

Since the enactment of the REA, ERISA pension plans have been required to provide

automatic survivor benefits, principally a "qualified joint and survivor annuity," to participants who

retire under such plans. *Dorn*, 211 F.3d at 943. A qualified joint and survivor annuity comprises

two separate and distinct benefits: (1) an annuity for the life of the participant, and (2) a succeeding

annuity for the life of the surviving spouse (if there is one) of not less than 50% of the participant

annuity. *Id.* A participant cannot waive the qualified joint and survivor annuity, except with spousal consent and only during an applicable election period, being a reasonable time before the annuity starting date, not to exceed ninety days. *Id.* at 943 n.14 (citing 29 U.S.C. § 1055(c)(1)(A)(i),)(2)(A)(i), 7(A)).

A. **Reynolds Metals has no obligation to pay to Ms. Cage a share of the pension benefits received by Mr. Bonner prior to his death.**

Ms. Cage bases her claim to a share of Mr. Bonner's retirement benefits on the 1975 Agreement Incident to Divorce attached to her First Original Petition. Plaintiff's First Original Petition, ¶ 5. The REA provisions regarding QDROs did not become effective until January 1, 1985; however, under the REA, plan administrators may, at their discretion, treat domestic relations orders entered before that date as QDROs. Pub. L. 98-397, § 303(a), 98 Stat. 1426, 1453 (1984). The courts have recognized a plan administrator's right to exercise its discretion by refusing to treat pre-REA orders as QDROs, especially where an order does not meet the requirements for a QDRO. *See, e.g., Samaroo v. Samaroo,* 193 F.3d 185, 187-88 & n.2 (3d Cir. 1999) (rejecting plaintiff's suggestion that pre-1985 divorce decree could be read to give plaintiff right to survivor's annuity because, among other reasons, original decree was silent on issue of survivor's rights and Congress has required QDROs to be specific in order to convey ERISA benefits, and original decree was entered before effective date of REA), *cert. denied sub nom. Samaroo v. AT&T Mgt. Pension Plan,* 120 S. Ct. 1573 (2000); *Rivers,* 186 F.3d at 682-83 (denying plaintiff's claim to community property share of former husband's pension where 1972 community property settlement agreement entered into in connection with divorce failed to address pension benefits and plaintiff failed to protect her rights by obtaining QDRO); *Barnes v. Maytag Corp.,* 799 F. Supp. 926, 931-32 (S.D. Ill. 1992)

(declining to abide by pre-1985 divorce decree property division because it did not meet requirements to be QDRO). *See also* S. Rep. 98-575 at 23 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2569 (encouraging plan administrators to treat existing domestic relations order as qualified "to the extent it is consistent with the provisions" of REA).

In this case, Reynolds Metals declined to treat the 1975 Agreement Incident to Divorce as a QDRO because it does not specifically address any division or assignment of Mr. Bonner's retirement benefits, nor does it make any reference to the Reynolds Metals Company Pension Plan for Hourly Employees (Plan 013).[5]   Dixon Aff. ¶ 5.   Ms. Cage has not presented an amended Agreement Incident to Divorce or other court order which meets the requirements of a QDRO and assigns her an interest in Mr. Bonner's joint and survivor annuity benefits. Dixon Aff. ¶ 6. In fact, Ms. Cage admits that her claim is based solely on the 1975 Agreement Incident to Divorce. *See* Plaintiff's First Original Petition ¶ 5. Therefore, in the absence of a QDRO, ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1), prohibits Ms. Cage from receiving a share of Mr. Bonner's joint and survivor annuity benefits. *Samaroo*, 193 F.3d at 190-91 (where original divorce decree was not QDRO and failed to designate former wife as alternate payee for survivor's annuity and amendment to divorce decree was made after husband's death, ERISA prohibited former wife from receiving survivor's annuity); *Rivers*, 186 F.3d at 682-83 (denying plaintiff's claim to community property share of former husband's pension, where no QDRO existed assigning share to plaintiff; *Dickerson v. Dickerson*, 803 F. Supp. 127, 134 (E.D. Tenn. 1992) (divorce decree awarding wife $8,000 from husband's pension plan was not QDRO under exception to ERISA's  spendthrift provision;

---

[5] Importantly, Reynolds Metals did not receive a copy of the 1975 Agreement Incident to Divorce until August 1998, more than two years after Mr. Bonner died.  Dixon Aff. ¶¶ 3, 5.

therefore, plan had no obligation to distribute money to former wife); *Kahn v. Kahn*, 801 F. Supp. 1237, 1246 (S.D.N.Y. 1992) (former wife not entitled to joint and survivor annuity where no QDRO existed designating her as surviving spouse/alternate payee); *Barnes*, 799 F. Supp. at 931-32 (denying survivor's annuity to disabled child of participant because no QDRO existed naming child as alternate payee and, therefore, payment of benefits to child was prohibited by ERISA's general rule prohibiting alienation of benefits). Accordingly, Reynolds Metals has no liability to Ms. Cage for a share of Mr. Bonner's retirement benefits.

The instant case is a mirror image of the *Rivers* case recently decided by the Fifth Circuit. In *Rivers*, the plaintiff and her former husband, Franklin, were married from February 2, 1946, until their divorce on February 16, 1972. 186 F.3d at 682. Franklin had been employed by Southwestern Electric Power Company ("SWEPCO") from September 16, 1952, until his retirement on April 11, 1983. *Id.* On the day of their divorce, a community property settlement agreement was entered into between Rivers and Franklin; the agreement did not address Franklin's pension benefits. *Id.* Franklin married his second wife, Carolyn, on February 19, 1972, and they remained married until Franklin's death on July 26, 1987. *Id.* On April 1, 1983, the day of his retirement, Franklin began receiving a joint and survivor annuity benefit from SWEPCO. *Id.* Upon Franklin's death, Carolyn was entitled to receive a survivor annuity equal to one-half of Franklin's pension. *Id.* On July 29, 1997, Rivers filed suit in state court against Central and South West Corporation (SWEPCO's parent company), and SWEPCO under Louisiana's community property laws asserting a claim to 24 ½ years' worth of Franklin's pension from SWEPCO, *Id.* Rivers requested that a QDRO be issued recognizing her as the rightful beneficiary of the pension plan, thereby remedying the parties' failure to include Franklins' retirement benefits in the divorce settlement agreement. *Id.* at 682-83. Central

and South West and SWEPCO removed the case to federal court.  *Id.* at 682.  The district court granted summary judgment to the defendants.  *Id.* at 683.

On appeal, the Fifth Circuit noted that ERISA generally preempts state law and that, under ERISA, a former spouse can replace the current spouse as the beneficiary of the plan if she obtains a QDRO recognizing the former spouse as an alternative payee.  *Id.*  The Fifth Circuit affirmed summary judgment for the defendants because Rivers failed to protect her rights by obtaining a QDRO prior to Franklin's retirement date.  *Id.*  Consequently, Franklin's pension benefits irrevocably vested in Carolyn on the date of Franklin's retirement and Rivers was forever barred from acquiring an interest in Franklin's pension plan.  *Id.* at 683-84.

Likewise, in this case, the 1975 Agreement Incident to Divorce did not address Mr. Bonner's retirement benefits.  See Plaintiff's First Original Petition ¶5 and attached Agreement Incident to Divorce.  Ms. Cage failed to protect her rights by obtaining a QDRO prior to Mr. Bonner's retirement in July 1992.[6]  Dixon Aff. ¶6; Plaintiff's First Original Petition ¶5.  Consequently, the pension benefits connected with Mr. Bonner's joint and survivor annuity expired on the date of his death and the survivor's benefit irrevocably vested in Madeline Bonner on the date of Mr. Bonner's retirement.  *Dorn*, 211 F.3d at 946-48; *Rivers*, 186 F.3d at 683-84.

Moreover, even if Ms. Cage were to obtain an order from a state court amending the 1975 Agreement Incident to Divorce or issuing a new order to specifically award Ms. Cage a community property share of Mr. Bonner's retirement benefits, the amended order would not qualify as a QDRO because it would require Reynolds Metals to pay increased benefits in violation of 29 U.S.C. § 1056(d)(3)(D)(ii).  Mr. Bonner retired in July 1992 and received benefits until his death in

---

[6] Furthermore, no QDRO was issued prior to Mr. Bonner's death in February 1996.

February 1996. Dixon Aff. ¶¶ 4, 6. Upon his death, Madeline Bonner began receiving the survivor's annuity. Dixon Aff. ¶¶ 4, 6. A court order requiring the Pension Plan to now pay benefits to Ms. Cage would have the effect of increasing the liability of the Plan; therefore, the order would not meet the requirements of a QDRO under federal law.[7] *See Samaroo*, 193 F.3d at 189-90.

For these reasons, Reynolds Metals is entitled to summary judgment on Ms. Cage's claim to a community property share of retirement benefits paid to Mr. Bonner prior to his death.

> **B.    Ms. Cage is not entitled to any share of the survivor's annuity because it vested in Madeline Bonner on the date Mr. Bonner retired.**

As noted above, ERISA, as amended by the REA, mandates that pension benefits be provided in the form of a joint and survivor annuity. *Boggs*, 117 S. Ct. 1754, 1761 (1997) (citing 29 U.S.C. § 1055(a)). ERISA further requires that every qualified joint and survivor annuity include an annuity payable to a non-participant surviving spouse of not less than 50% of the amount of the annuity which is payable during the joint lives of the participant and spouse. *Boggs*, 117 S. Ct. at 1761 (citing 29 U.S.C. § 1055(d)(1). A participating spouse is not permitted to waive the qualified joint and survivor annuity option unless the non-participating spouse consents in writing to waive the benefits. *Id.* (citing 29 U.S.C. § 1055(c)(2)); *Kahn*, 801 F. Supp. at 1241.

In this case, Mr. Bonner's surviving spouse is Madeline Bonner, to whom he was married from 1983 until his death in February 1996. Dixon Aff. ¶ 2. Madeline Bonner began receiving the survivor's annuity upon Mr. Bonner's death. Dixon Aff. ¶ 4.

ERISA provides that a **former** spouse may be considered the surviving spouse for purposes of receiving the survivor's annuity "to the extent provided for in any qualified domestic relations

---

[7] If Ms. Cage were to obtain a QDRO at this point, her claim for recovery of a share of Mr. Bonner's pension benefits would be against Mr. Bonner's estate.

order." 29 U.S.C. § 1056(d)(3)(F). In other words, a former spouse retains the right under ERISA to survivor benefits if a QDRO provides for such status. *Kahn*, 801 F. Supp. at 1245. As discussed above, no QDRO has been issued in this case.[8] In the absence of a QDRO naming Ms. Cage as Mr. Bonner's surviving spouse for purposes of receiving the survivor's annuity, she is not entitled to such annuity. *Dorn*, 211 F.3d at 946-48 (QDRO named plaintiff as alternative payee for receipt of former husband's pension benefits, but did not designate her as surviving spouse; therefore, upon former husband's death, plaintiff not entitled to continue to receive portion of pension benefits or to receive survivor's annuity); *Rivers*, 186 F.3d at 683-84 (where no QDRO existed designating plaintiff as surviving spouse prior to retirement of former husband, survivor's annuity vested in current wife on date of husband's retirement and barred plaintiff from acquiring interest in former husband's pension plan).

Furthermore, any court order obtained by Ms. Cage after Mr. Bonner's retirement in July 1992 would be ineffective to designate Ms. Cage as the surviving spouse because the order would not be a QDRO. A survivor's annuity vests in the surviving spouse on the date the participating spouse retires. *Rivers*, 186 F.3d at 683-84; *Hopkins v. AT&T Global Info. Solutions Co.*, 105 F.3d 153, 156-67 (4th Cir. 1997). A surviving spouse is a beneficiary under a plan, not a participant. *Hopkins*, 105 F.3d at 156. In order to be "qualified," a domestic relations order must relate to a benefit "payable with respect to a participant." *Hopkins*, 105 F.3d at 156-57 (citing 29 U.S.C. § 1056(d)(3)(B)(i)(I)). Since the survivor's annuity vested in Madeline Bonner on July 15, 1992, the date of Mr. Bonner's retirement, any domestic relations order obtained by Ms. Cage after July 15, 1992, naming her as the surviving spouse or purporting to grant her a share of the survivor's

---

[8] Moreover, the 1975 Agreement Incident to Divorce does not designate Ms. Cage as the surviving spouse for purposes of receiving the survivor's annuity.

annuity would relate to a benefit payable to a beneficiary, not a participant, and thus cannot constitute a QDRO. *Hopkins*, 105 F.3d at 156-57. *Accord Rivers*, 186 F.3d at 683 (adopting reasoning in *Hopkins*). Accordingly, Ms. Cage is not entitled to any share of the survivor's annuity being paid to Madeline Bonner, and Reynolds Metals cannot pay any such benefit to Ms. Cage.

## CONCLUSION

For the foregoing reasons, Reynolds Metals submits that there is no genuine issue of material fact with respect to Ms. Cage's claims; therefore, it is entitled to summary judgment as a matter of law.

WHEREFORE, PREMISES CONSIDERED, Reynolds Metals prays that it be granted summary judgment against Ms. Cage with respect to all of the claims in Plaintiff's First Original Petition, and that Reynolds Metals be awarded such other relief, both legal and equitable, to which it may be justly entitled.

Dated: June 29, 2000.

Respectfully submitted,

Of Counsel:
Bracewell & Patterson, L.L.P.

Robert S. Nichols
Attorney-in-Charge
Southern District of Texas Bar No. 17118
State Bar No. 15006400
2000 One Shoreline Plaza-South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas 78401-3700
Telephone: (361) 882-6644
Telecopier: (361) 882-6659

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LOIS JEAN CAGE | § | |
| | § | |
| v. | § | CIVIL ACTION NO. C-00-093 |
| | § | |
| MADELINE E. BONNER, | § | |
| THE ESTATE OF SAMUEL BONNER | § | |
| AND REYNOLDS METALS COMPANY | § | |

## PLAINTIFF LOIS JEAN CAGE'S AND
## REYNOLDS METALS COMPANY'S STIPULATED FACTS

In accordance with the Court's instruction at the Scheduling Conference on May 30, 2000, the parties have agreed to the following stipulated facts in connection with their motions for summary judgment.

1.      Samuel Bonner was employed by Reynolds Metals from on or about March 31, 1960, until his retirement on or about July 15, 1992. Dixon Aff. ¶ 2.[1]

2.      During his employment, Mr. Bonner was a participant in the Reynolds Metals Company Pension Plan for Hourly Employees (Plan 013) ("Pension Plan"). Dixon Aff. ¶ 2 and Ex. A.

3.      At the time of his retirement, Mr. Bonner's wife was Madeline Bonner, to whom he had been married since on or about March 15, 1983. Dixon Aff. ¶ 2 and Ex. B.

---

[1] The Affidavit of Ellen M. Dixon ("Dixon Aff.") with exhibits, referred to in the Stipulated Facts, is attached to Reynolds Metals' second motion for summary judgment under Tab 2.

4.     Prior to his marriage to Madeline Bonner, Mr. Bonner was married to Plaintiff Lois Jean Cage from on or about December 15, 1956 until their divorce on or about September 30, 1975. Dixon Aff. ¶ 3 and Ex. C; Plaintiff's First Original Petition ¶ 5.

5.     Pursuant to an Agreement Incident to Divorce issued in 1975. the community property of Ms. Cage and Mr. Bonner was divided. Plaintiff's First Original Petition ¶ 5 and Agreement Incident to Divorce attached thereto.

6.     The Agreement Incident to Divorce does not specifically list Mr. Bonner's retirement benefits under the Pension Plan as an item of community property to be divided, nor does it otherwise specifically refer to the Pension Plan  *See* Plaintiff's First Original Petition ¶ 5 and attached Agreement Incident to Divorce.  However, a provision in the Agreement states:

> All community property which is not listed in any attached Schedule shall be owned by Wife and Husband as equal cotenants; and each party hereby conveys and assigns to the other an undivided one-half interest in any community property, owned by the granting party, which is not listed on any attached Schedule.

Agreement Incident to Divorce ¶ II.D.

7.     Upon his retirement on or about July 15. 1992, Mr. Bonner applied for benefits under the Pension Plan. Dixon Aff. ¶ 3.

8.     In connection with his request for pension benefits, Mr. Bonner submitted to Reynolds Metals the September 30, 1975 Divorce Decree dissolving the marriage of Mr. Bonner and his former wife, Lois Jean Bonner (now known as Lois Jean Cage). Dixon Aff. ¶ 3 and Ex. C.

9.     Mr. Bonner did not submit nor did Reynolds Metals receive a copy of the 1975 Agreement Incident to Divorce until August 1998. Dixon Aff.  ¶¶ 3,5.

10.     The 1975 Divorce Decree submitted to Reynolds Metals by Mr. Bonner does not specifically identify or refer to the Pension Plan, nor does it specifically refer to Mr. Bonner's retirement benefits; based on the information it was provided, Reynolds Metals concluded that Ms. Cage was not entitled to a share of Mr. Bonner's retirement benefits.  Dixon Aff. ¶ 3 and Ex. C.

11.     In August 1992, Mr. Bonner began receiving benefits under the Pension Plan. Dixon Aff. ¶ 4.

12.     Mr. Bonner subsequently died on or about February 2, 1996.  Plaintiff's First Original Petition ¶ 5; Dixon Aff. ¶ 4.

13.     Madeline Bonner, Mr. Bonner's wife at the time of his death, began receiving a survivor's annuity upon Mr. Bonner's death and continues to receive that benefit today.  Dixon Aff. ¶ 4.

14.     On or about August 1998, Ms. Cage, through an attorney, submitted to Reynolds Metals a copy of the Agreement Incident to Divorce dividing the marital assets of Mr. Bonner and Ms. Cage in connection with their divorce in September 1975, and requested assistance in determining her entitlement to any retirement proceeds which may have accrued during her marriage to Mr. Bonner.  Dixon Aff. ¶ 5.

15.     After reviewing the 1975 Agreement Incident to Divorce, Reynolds Metals determined that the Agreement did not specifically address any division or assignment of retirement benefits from the Pension Plan, nor did it contain any provision addressing the method of dividing the retirement benefits between Ms. Cage and Mr. Bonner.  Dixon Aff. ¶ 5.  Reynolds Metals therefore concluded that Ms. Cage was not entitled to a share of Mr. Bonner's retirement benefits.  Dixon Aff. ¶ 5.

16.     It is Reynolds Metals' belief that Ms. Cage has not presented to Reynolds Metals an amended Agreement Incident to Divorce or other court order which meets the requirements of a qualified domestic relations order and assigns her an interest in Mr. Bonner's retirement benefits or names her as Mr. Bonner's surviving spouse for purposes of receiving the survivor's annuity. Dixon Aff. ¶ 6.

17.     Ms. Cage filed this action on or about January 28, 2000, seeking "her community property share of the retirement proceeds" to which Mr. Bonner was entitled.   Plaintiff's First Original Petition ¶ 6.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LOIS JEAN CAGE | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. C-00-093 |
| | § | |
| MADELINE E. BONNER, | § | |
| THE ESTATE OF SAMUEL BONNER | § | |
| AND REYNOLDS METALS COMPANY | § | |

**AFFIDAVIT OF ELLEN M. DIXON
IN SUPPORT OF DEFENDANT REYNOLDS METALS'
SECOND MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| STATE OF VIRGINIA | § |
| | § |
| COUNTY OF HENRICO | § |

Ellen M. Dixon, after having been sworn, did state the following:

1.      My name is Ellen M. Dixon and I hold the position of Administrator, Hourly Pensions of Reynolds Metals Company. I have held this position since 1998. I am over 18 years of age and have never been declared legally incompetent. In my position as Administrator, Hourly Pensions of Reynolds Metals Company, I have knowledge of the following facts, based either on personal knowledge or my review of Reynolds Metals' business record.

2.      Samuel Bonner was employed by Reynolds Metals from on or about March 31, 1960, until his retirement on or about July 15, 1992. During his employment, Mr. Bonner was a participant in the Reynolds Metals Company Pension Plan for Hourly Employees (Plan 013) ("Pension Plan"), which is an employee benefit plan governed by the Employee Retirement Income Security Act ("ERISA"). A copy of the Pension Plan Summary is attached hereto as Exhibit A. At the time of his retirement, Mr. Bonner's wife was Madeline Bonner, to whom he had been married since on or about March 15, 1983. A copy of the marriage license submitted to Reynolds Metals by

Madeline Bonner is attached hereto as Exhibit B.

    3.      Upon his retirement on or about July 15, 1992, Mr. Bonner applied for retirement benefits under the Pension Plan in the form of a joint and survivor annuity. In connection with his request for pension benefits, Mr. Bonner submitted to Reynolds Metals the September 30, 1975 Divorce Decree dissolving the marriage of Mr. Bonner and his former wife, Lois Jean Bonner (now known as Lois Jean Cage). A copy of the 1975 Divorce Decree is attached hereto as Exhibit C. The Divorce Decree does not divide the marital property; based on the information provided, Reynolds Metals concluded that Ms. Cage was not entitled to a share of Mr. Bonner's retirement benefits.

    4.      In August 1992, Mr. Bonner began receiving the joint and survivor annuity benefit under the Pension Plan. Mr. Bonner designated Madeline Bonner, his current wife, as his surviving spouse for purposes of receiving the surviving spouse annuity. Mr. Bonner subsequently died on or about February 2,1996. As the surviving spouse, Madeline Bonner began receiving the survivor's annuity and continues to receive that benefit today.

    5.      In or about August 1998, Ms. Cage, through an attorney, submitted to Reynolds Metals a copy of the Agreement Incident to Divorce dividing the marital assets of Mr. Bonner and Ms. Cage in connection with their divorce in September 1975 and requested assistance in determining her entitlement to any retirement proceeds which may have accumulated during her marriage to Mr. Bonner. After reviewing the 1975 Agreement Incident to Divorce, Reynolds Metals concluded that since the Agreement did not specifically address any division or assignment of retirement benefits from the Pension Plan, nor did it contain any provision addressing the method of dividing the retirement benefits between Ms. Cage and Mr. Bonner, Ms. Cage was not entitled to a share of Mr. Bonner's joint and survivor annuity.

-2-

A

CutePDF – www.fastio.com

# Your Pension Plan

Plan Highlights ................................................... 3

When You Are Eligible For A Pension ........................ 6
    65–5 Retirement—Normal Retirement ..................... 6
    62–10 Retirement .......................................... 6
    60–10 Retirement .......................................... 6
    30–Year Retirement ....................................... 6
    Disability Pension ......................................... 6
    Special Pensions .......................................... 7
        70–80 Special Pension ................................ 7
        Rule Of 65 Pension .................................. 7
        55–10 Special Pension ............................... 7
    Vested Pension ............................................ 8

How Much You Can Receive .................................. 8
    Basic Benefits ............................................. 8
    Special Retirement Payment .............................. 9
        Rollovers ............................................. 9
    Supplemental Benefits .................................... 9
    Graded Minimum Benefit Supplement ................... 10

Your Total Retirement Income .............................. 12
    Estimates Of Monthly Income ............................ 13

Surviving Spouse Pensions ................................. 14
    Death Before Retirement ................................. 14
        While Actively Employed ............................ 14
        After Termination – Vested .......................... 14
    Death After Retirement .................................. 15

Other Important Facts ...................................... 16
    Employees Covered ...................................... 16
    How Your Service Is Counted ............................ 16
    Applying For Benefits .................................... 17
    IRS Approval ............................................ 18
    Your Right to Benefits ................................... 18
    Changing Or Ending The Plan ............................ 18
    Plan Insurance .......................................... 18

Retirement (A8)10/75:

# Plan Highlights

Under agreements between the Company and the Union, this Plan provides benefits that are among the best of those negotiated with any major industrial company in the U.S. Eligibility for Plan participation is described under *"Employees Covered."* As you will see in the pages that follow, the Plan can pay you a pension at retirement any time from age 60 on (earlier in some cases), or in the event of disability, termination before retirement, or after extended layoff in case of plant shutdown.

The Plan provisions summarized under this tab are effective June 1, 1993, unless otherwise noted. Listed below are a number of improvements and the dates they take effect. These improvements are discussed in detail in the following summary of your Plan benefits.

- Pension factors increased effective June 1, 1992, and again on June 1, 1993.

- Disability retirement minimum pension increased to $400 for all retirements on or after June 1, 1993.

- Effective January 1, 1994, a graded minimum benefit supplement is available to any retiring Participant who has reached age 55 and has at least 30 years of service.

- "Maximum Benefit" provision removed.

The following chart highlights the main Plan features. Keep in mind that the chart is intended as a brief summary of how the Plan works. Actual Plan provisions are subject to the terms and conditions of the formal Plan documents. For added details, be sure to check the sections referred to in the chart as well as the complete Plan text included at the end of this tab.

*This is a summary of the Pension Plan in effect as of June 1, 1993, as it applies to hourly Employees of the Company represented by the Union at the plants listed under the heading, "Employees Covered." The Plan also covers certain other employees of the Company.*

*Every attempt has been made to ensure that this summary plan description (SPD) accurately reflects the provisions of the Plan document. However, if the information contained in the SPD disagrees with the Plan document, the provisions of the Plan document will control.*

# You may be eligible for . . .

| Full Basic Benefits immediately | Reduced Basic Benefits as early as 55 or full Basic Benefits at 62 | Special Retirement Payment | Supplemental Benefits until 62 or Social Security starts | Graded Minimum Benefit Supplement until 62 and full Basic Benefit thereafter | Social Security Benefits |
|---|---|---|---|---|---|
| X | | X | | | Full retirement benefit immediately |
| X | | X | | | |
| | X | X | | | Reduced retirement benefit as early as 62 or full benefit at 65 |
| X | | X | | | |
| X | | X | X | X | |
| X | | | X | | |
| X | | X | | | If you qualify, disability benefits after 5 months of disability, otherwise reduced retirement benefit as early as 62 or full retirement benefit at 65 |
| X | | X | X | | |
| X | | X | X | | |
| X | | X | | | |
| X | | X | X | | Reduced retirement benefit as early as 62 or full benefit at 65 |
| X | | X | X | | |
| X | | X | X | | |
| | X | | | | Reduced retirement benefit as early as 62 or full benefit at 65 |

*If you are not eligible for Social Security disability payments,* you will receive:

- *full* Basic Benefits—based on service to retirement for disability with a minimum benefit of $250 a month ($400 a month for all disability retirements on or after June 1, 1993)—starting the month following retirement, plus

- a supplemental benefit of $400 a month, starting the month following disability retirement and continuing to age 62, when Social Security retirement benefits become payable, unless they stop earlier because you become eligible for Social Security disability benefits.

Disability pensions are *not* payable if disability results from participating in a criminal act, habitual drunkenness, addiction to narcotics, intentionally self-inflicted injury or if disability occurs during military service and prevents your return to work. Also, prior to age 62, medical evidence of your continuing disability may be required from time to time.

# Special Pensions

In addition to regular and disability retirement, there are other times—often resulting from causes beyond your control or the Company's—when immediate pensions can be paid just as though you were retiring at age 62 or later.

Briefly, here's how the three *special early retirement pensions* work.

## 70–80 Special Pension

There are two ways to qualify for the age and service requirements for this special pension:

- at age 55 or older with at least 10 years of service, if your age plus years of service add up to 70 or more—for example, age 57 plus 13 years of service, or

- at any age with at least 10 years of service, if your age plus years of service add up to 80 or more.

If you meet either of these age and service requirements, you are eligible for a 70-80 Special Pension in the following situations:

- if you are displaced from your department as a result of a permanent shutdown of a plant or department, or

- if you have been absent because of other layoff, injury or illness for two years.

If you qualify, you will be eligible for:

- a Special Retirement Payment the month after you retire,

- *full* Basic Benefits—based on service to retirement—starting the fourth month following retirement, *and*

- a supplemental benefit of $400 per month, starting the fourth month following retirement and continuing to age 62 (or until you are eligible for Social Security disability benefits, if earlier).

## Rule Of 65 Pension

As added protection for long-service employees under age 55, the Rule of 65 Pension applies in the following situations if you have at least 20 years of service as of your Last Day Worked, and your age plus years of service add up to 65 or more:

- if you are absent because of layoff, sickness, or accident for two years, and the Company fails to provide you with suitable long-term employment, or

- if you are laid off for less than two years due to an energy-related plant or department shutdown, and the Company fails to provide you with suitable long-term employment.

You can find definitions of suitable long-term employment and provisions relating to the offer and acceptance of suitable long-term employment in *"Appendix A"* of the Plan text.

Benefits payable to Employees eligible for a Rule of 65 Pension are the same as those described above for 70-80 special pensions, with one important exception. The $400-a-month supplemental benefit otherwise payable to rule of 65 retirees will be reduced by one-half of any earned income over $5,500 a year. More information about how this limitation might apply in a particular situation is available from your Human Resources Office.

## 55–10 Special Pension

If you are at least age 55 and have 10 or more years of service—but don't meet the age and service requirements for either the 70-80 or Rule of 65 Pensions—you could still qualify for an immediate pension:

- if you are laid off as a result of a permanent shutdown of a plant or department, or

- after you have been absent for three consecutive years due to layoff, sickness or accident.

In this situation, you would be eligible for:

- a Special Retirement Payment the month after you retire, and

- *full* Basic Benefits—based on your service to retirement—starting the fourth month after you retire.

Full Basic Benefits as described above are payable when you retire under any of the various retirement rules, with these three exceptions:

1) Under the rules for 60-10 retirement and vested pensions, full Basic Benefits are not payable until age 62. In these two cases, full Basic Benefits will be reduced by $1/2$ of 1% for each month (6% for each year) payments are made after age 60 but prior to age 62.

2) If you are married when your Reynolds pension starts and your Basic Benefit is paid in the form of a surviving spouse benefit, your monthly Basic Benefit will be reduced by 5% to provide continuing income to your spouse after your death. For details, see *"Surviving Spouse Pensions."*

3) Basic Benefits paid under a disability pension will stop if the Employee recovers before age 62.

## Special Retirement Payment

This is a lump sum payment you receive in the month after you retire, except on permanent disability retirements or deferred vested pensions. The amount of this one time payment equals:

**10 Weeks Of *Vacation Pay***

*plus*

**The Number of Weeks Of Regular Vacation Pay You Are Entitled To For Which You Have Not Received Pay In The Year In Which You Retire**

Slightly different rules may apply if you are not entitled to a vacation in the year you retire.

### Rollovers

If you receive a special retirement payment (SRP), you may be able to exclude the distribution from your taxable gross income if you roll it over to an individual retirement account (IRA) or the eligible pension plan of another employer. You have two options:

• You may elect a direct rollover from this Plan to an IRA or eligible pension plan that accepts rollovers. A check will be issued to you in the name of the IRA or pension plan, and it is your responsibility to deliver the rollover.

**OR**

• You may elect to have payment from the Plan made to you and you make the rollover. In this case, a check is issued in your name, and you must make the rollover within 60 days of the date you receive the distribution or it will be taxed in the current year. In addition, 20% of your SRP will be withheld automatically for Federal Income Tax. You may still roll over 100 percent of your SRP, but you must use other funds to replace the 20% withheld.

See your Human Resources Office for more information on rollovers and the appropriate forms.

## Supplemental Benefits

These are designed to provide added monthly income in certain situations where retirement takes place before Social Security benefits become payable.

Supplemental benefits of $400 a month are payable if you qualify for:

• 70-80 Pension, or

• Rule of 65 Pension, or

• disability pension,

*and* you are not eligible for Social Security disability benefits. As discussed earlier, supplemental benefits paid under Rule of 65 Pensions may be reduced if you have earned income.

Supplemental benefits continue until 62—the age at which reduced Social Security retirement benefits can begin. Supplemental benefits will stop earlier if you qualify for Social Security disability benefits or you recover from a disability before age 62.

THIS PAGE LEFT BLANK INTENTIONALLY

# Estimates Of Monthly Income

## r Retirement At Age 65

### Years Of Benefit Service

| | 0 | | | 25 | | | 30 | | | 35 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| rement ass | R nolds Pension | Social Security | Total | Reynolds Pension | Social Security | Total | Reynolds Pension | Social Security | Total | Reynolds Pension | Social Security | Total |
| 1– 4) | 525 | $ 800 | $1,325 | $ 656 | $ 800 | $1,456 | $ 788 | $ 800 | $1,588 | $ 919 | $ 800 | $1,719 |
| 5– 8) | 538 | $ 820 | $1,358 | $ 673 | $ 320 | $1,493 | $ 807 | $ 820 | $1,627 | $ 942 | $ 820 | $1,762 |
| 9–12) | 551 | $ 844 | $1,395 | $ 689 | $ 844 | $1,533 | $ 827 | $ 844 | $1,671 | $ 964 | $ 844 | $1,808 |
| 3–16) | 565 | $ 868 | $1,433 | $ 706 | $ 868 | $1,574 | $ 848 | $ 868 | $1,716 | $ 989 | $ 868 | $1,857 |
| 7–20) | 578 | $ 891 | $1,469 | $ 723 | $ 891 | $1,614 | $ 867 | $ 891 | $1,758 | $1,012 | $ 891 | $1,903 |
| 1–24) | 591 | $ 911 | $1,502 | $ 739 | $ 911 | $1,650 | $ 887 | $ 911 | $1,798 | $1,034 | $ 911 | $1,945 |
| 5 & above) | $ 605 | $ 935 | $1,540 | $ 756 | $ 935 | $1,691 | $ 908 | $ 935 | $1,843 | $1,059 | $ 935 | $1,994 |

## r Retirement At Age 62

### Years Of Benefit Service

| | 7 | | | 22 | | | 27 | | | 32 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| irement ass | R nolds Pension | Social Security | Total | Reynolds Pension | Social Security | Total | Reynolds Pension | Social Security | Total | Reynolds Pension | Social Security | Total |
| 1– 4) | 46 | $ 648 | $1,094 | $ 578 | $ 648 | $1,226 | $ 709 | $ 648 | $1,357 | $ 840 | $ 648 | $1,488 |
| 5– 8) | 7 | $ 664 | $1,121 | $ 592 | $ 664 | $1,256 | $ 726 | $ 664 | $1,390 | $ 861 | $ 664 | $1,525 |
| –12) | 8 | $ 684 | $1,152 | $ 606 | $ 684 | $1,290 | $ 744 | $ 684 | $1,428 | $ 882 | $ 684 | $1,566 |
| –16) | 0 | $ 702 | $1,182 | $ 622 | $ 702 | $1,324 | $ 763 | $ 702 | $1,465 | $ 904 | $ 702 | $1,606 |
| –20) | | $ 721 | $1,212 | $ 636 | $ 721 | $1,357 | $ 780 | $ 721 | $1,501 | $ 925 | $ 721 | $1,646 |
| –24) | 2 | $ 738 | $1,240 | $ 650 | $ 738 | $1,388 | $ 798 | $ 738 | $2,536 | $ 946 | $ 738 | $1,684 |
| & above) | 4 | $ 757 | $1,271 | $ 666 | $ 757 | $1,423 | $ 817 | $ 757 | $1,574 | $ 968 | $ 757 | $1,725 |

on Plan a nts shown are based on the pension factors effective June 1, 1993.

ok 2
Re ent (AB) 9/9.

13

Spouse's coverage for both active and terminated vested Participants ends when you cease to have a spouse; however, coverage will automatically be reinstated if you remarry. This is true for vested Participants even if you leave the Company before you retire.

## Death After Retirement

If you retire from active employment, the surviving spouse pension is paid automatically if you and your spouse were married at your retirement—unless you specifically request in writing, and obtain your spouse's written consent, to reject this benefit when applying for your own pension to begin.

If you do not reject this protection, your monthly Basic Benefit will be reduced by 5% to provide your surviving spouse with lifetime pension income after your death. The amount of the surviving spouse pension will equal 50% of your reduced monthly Basic Benefit.

Of course, if you decline surviving spouse pension coverage when you retire, your own pension will not be reduced; however, all payments from the Plan will stop upon your death.

In the event you have accepted the 5% reduction to provide a benefit for your spouse and your spouse dies before you, your full Basic Benefit will be restored after the Company is notified in writing of such death. If you become lawfully divorced, you should also notify the Company. You may be able to have your full Basic Benefit restored unless a qualified domestic relations order prevents it as explained under *"Your Right To Benefits."* Otherwise, your former spouse will continue to be eligible to receive the surviving spouse pension.

**Graded Minimum Benefit Supplement.** Effective January 1, 1994, if you die after retirement but before you reach age 62, your spouse is entitled to 50 percent of your graded minimum benefit supplement amount if:

–you were receiving a graded minimum benefit supplement at the time of your death; and

–you and your spouse were married when you first retired.

The benefit is payable up to the month following the month in which your 62nd birthday would have occurred. At that time, your spouse's pension will continue under the 50% Basic Benefit described above.

**If your employment terminates before you are eligible to retire** and you have vested rights under the Plan, the surviving spouse pension is paid automatically if you and your spouse were married at the time your vested pension becomes payable—unless you specifically request, in writing, and obtain your spouse's written consent to reject this coverage before your own pension begins..

If you do not so waive surviving spouse pension coverage, the monthly Basic Benefit payable during your lifetime will be reduced in order to provide the added coverage for your spouse. The amount your benefit will be reduced depends on the cost of the pre-retirement spouse's benefit protection and the difference in age between you and your spouse as outlined below.

| If your spouse is this many years YOUNGER than you | you will receive this percentage of your monthly vested benefit |
|---|---|
| 20 or more | 77% |
| 17– 19 | 78 |
| 14 –16 | 79 |
| 11– 13 | 81 |
| 8 – 10 | 82 |
| 5 – 7 | 84 |
| 2 – 4 | 85 |
| 0 – 1 | 87 |

| If your spouse is this many years OLDER than you | you will receive this percentage of your monthly vested benefit |
|---|---|
| 0 – 1 | 87% |
| 2 – 4 | 89 |
| 5 – 7 | 90 |
| 8 – 10 | 92 |
| 11 – 13 | 93 |
| 14 – 16 | 95 |
| 17 – 19 | 96 |
| 20 or more | 97 |

If the period of termination is more than five years, you will still receive credit for your prior service if the period of termination is less than your length of prior service and you complete a year of continuous service after rehire.

> **Example:** Suppose you leave the Company in 1987 after three years of service, and come back to work four years later. You would not lose your prior service, since you need at least a five-year absence before losing your prior service. If you had left the Company after five years of service and came back to work after a seven-year absence, you would lose your prior service because the number of years of absence is greater than five and is also greater than the number of your prior years of service.

*If you leave the Company on or after January 1, 1989,* with less than five years of service and are later rehired, you retain credit for your prior service provided:

- the period between your termination and rehire is less than five years, and

- you complete a year of continuous service after you are rehired.

Also, if you leave the Company on or after June 1, 1986, on account of the birth or adoption of a child, you may receive credit for your prior service if you return to work within six years instead of five as described above.

In addition, if you:

- left the Company before June 1, 1977,

- had at least one year of service when you left,

- had employment status on June 1, 1977, and

- returned to work before the period of absence exceeded your length of service when you left,

your period of service prior to the absence will be restored and will count as service in calculating the *amount* of your Reynolds pension, other than a deferred vested pension, when you retire. (The absence period will not, however, count as service in determining your *eligibility* for a pension.)

An Employee who left the Company before January 1, 1989 with 10 or more years of service and is later rehired will have his prior service restored. An Employee who leaves the Company after January 1, 1989 will have his prior service restored upon reemployment, provided he had five or more years of service when he left employment.

A *retiree* who is reemployed by the Company will have his pension discontinued. If you are reemployed and are covered under a labor agreement which incorporates this Plan by reference, you will accrue additional service while reemployed.

Pensions for certain Employees rehired on or after June 1, 1980, after an absence of three years or more will be calculated under the pension plan in effect when they left, unless the period of reemployment is five years or more. This rule applies to Employees who had previously retired (including retirement for disability) or had been eligible for a vested pension when they last left employment.

Also, special Plan rules apply to Employees who transfer to an affiliated Reynolds Company, or who become eligible for another Reynolds pension plan as a result of a change in Employee status. For more details about how your service is counted in these situations, check with your Human Resources Office.

## Applying For Benefits

Pension Plan benefits are not paid automatically. You must apply for them in writing before your intended retirement date. Appropriate pension application and election forms are available through your Human Resources Office. About nine months before you become eligible for 60-10 Retirement, you will receive an explanation of the surviving spouse pension payment method for Basic Benefits. Further details regarding your individual benefit amounts will also be furnished on request.

If your pension application is denied in whole or in part, you—or your beneficiary—will receive a written notice of the denial within 90 days after receipt of your application. This notice will explain:

- the specific reason for the denial,

- the specific Plan provisions on which the denial is based,

- any additional information required (such as spouse's data) needed to reconsider the application, and an explanation of why this information is needed, and

- an explanation of the Plan's appeal procedure.

Upon receipt of this denial notice, you may file an appeal with the Appeals Board established in accordance with the Plan document. The Plan provides that in the event of any differences between you and the Company as to your rights to a pension or the amount of your pension and agreement cannot be reached between the Company and the Union, an Appeals

plan has been in effect less than five years before it terminates, or if benefits have been increased within the five years before plan termination, the whole amount of the plan's vested benefits or the benefit increase may not be guaranteed. In addition, there is a ceiling on the amount of monthly benefit that PBGC guarantees, which is adjusted periodically.

For more information on the PBGC insurance protection and its limitations, contact either the Corporate Director, Compensation and Benefits, Reynolds Metals Company, or the PBGC. Inquiries to the PBGC should be addressed to the Office of Communications, PBGC, 2020 K Street N.W.,Washington, D.C. 20006. The PBGC Office of Communications may also be reached by calling (202) 254-4817.

**ERISA Compliance**

The information contained under the *"Getting Started," "Key Events"* and *"Retirement"* tabs, comprise the Summary Plan Description for the *Reynolds Metals Company Pension Plan for Hourly Employees* as required by the Employee Retirement Income Security Act of 1974 (ERISA).

B

CVisPDF – www.fastio.com



The **STATE OF TEXAS** №. 772

# Marriage License

## COUNTY OF
### REFUGIO

To all licensed or ordained Christian Ministers and Priests, Jewish Rabbis, or persons who are officers of religious organizations, and who are duly authorized by the organization to conduct marriage ceremonies, Justices of the supreme court, Judges of the court of criminal appeals, Justices of the courts of civil appeals, Judges of the district county, and probate courts, Judges of the county courts at law, courts of domestic relations and juvenile courts, Justices of the peace, and Judges of the Federal courts of this State.

## GREETING:
## YOU ARE HEREBY AUTHORIZED TO SOLEMNIZE THE
## RITES OF MATRIMONY

*Between Mr.* Samuel Floyd Bonner

*and Ms.* Madeline Evon Bonner

*and make due return to the Clerk of the County Court of said County within Thirty days thereafter, certifying your action under this License*

*Witness my official signature and seal of office at office in* REFUGIO *Texas, this the*
14th *day of* March *A. D. 19* 83

Rebekah Scott *Clerk County Court*
REFUGIO *County, Texas*

*By* Sandra Kruger *Deputy*

*I hereby certify that on the* Fifteenth
*day of* March *A. D. 19* 83
*I united in Marriage the parties above named*

*Witness my hand this* 15th *day of* March *A. D. 19* 83

Rev. John H. Ensell
*Signature of person performing ceremony*

Baptist Minister
*Title of person performing ceremony*

517 Ashby
*Address of person performing ceremony*

*County of Marriage:*
Refugio *County, Texas*

*Returned and filed for record the* 16th *day of* March 19 83
*and recorded the* 23rd *day of* March 19 83
*in Book* N *Page* 217 *Marriage Records of* REFUGIO *County*

*By* [signature] *Deputy* Rebekah Scott *County Clerk*

NO. 4930

| IN THE MATTER OF THE MARRIAGE | X | IN THE DISTRICT COURT OF |
| OF LOIS JEAN BONNER | X | |
| AND SAMUEL FLOYD BONNER | X | |
| AND IN THE INTEREST OF | X | REFUGIO COUNTY, TEXAS |
| CHET KERWIN BONNER and | X | |
| CHAD KELVIN BONNER, Children | X | 24th JUDICIAL DISTRICT |

## DECREE OF DIVORCE

On the 22nd day of September, 1975, trial on the merits was held in this cause.

The Petitioner appeared in person and by attorney and announced ready for trial. The Respondent appeared in person.

The Court, after examining the pleadings and listening to the evidence and argument of counsel, finds that it has jurisdiction over this cause and the parties and that Petitioner's Original Petition for Divorce has been on file in this Court for at least 60 days.

The Court finds that at the time this suit was filed, Petitioner had been a domiciliary of this state for the preceding six months and a resident of this county for the preceding 90 days.

No jury having been demanded by either of the parties, all matters in controversy, including all questions of fact and of law, were submitted to the Court. The Court is of the opinion that the material allegations in Petitioner's Original Petition for Divorce are substantially correct and have been proved by full and satisfactory evidence. The Court finds that a divorce should be granted.

1.

IT IS THEREFORE ORDERED that the bonds of matrimony between the Petitioner LOIS JEAN BONNER and Respondent SAMUEL FLOYD BONNER be and are hereby dissolved, and a decree of divorce is hereby granted to LOIS JEAN BONNER.

The Court finds that there were born to or adopted by the parties of this marriage the following children now under the age of eighteen (18) years:

CHET KERWIN BONNER, a male, born December 16, 1959; and

CHAD KELVIN BONNER, a male, born August 25, 1963.

The Court finds that the best interest of the children will be served by appointing LOIS JEAN BONNER, as managing conservator, to have the rights, duties and responsibilities set forth below.

IT IS THEREFORE ORDERED AND DECREED that LOIS JEAN BONNER be and is hereby appointed managing conservator of the children.

IT IS FURTHER ORDERED AND DECREED that the managing conservator shall have all the rights, privileges, duties and powers of a parent, to the exclusion of the other parent, subject to the rights, privileges, duties and powers of a possessory conservator as named in this order.

The Court further finds that the best interest of the children will be served by appointing SAMUEL FLOYD BONNER as a possessory conservator of the children.

IT IS THEREFORE ORDERED AND DECREED that SAMUEL FLOYD BONNER be and is hereby appointed possessory conservator of the children.

IT IS FURTHER ORDERED AND DECREED that the possessory conservator shall have the possession of the children as follows:

and is directed to return the children to the home of the managing conservator by Six O'Clock P.M. the following Sunday, starting on the 3rd day of October, 1975.

2.

IT IS FURTHER ORDERED AND DECREED that the possessory conservator shall have the following rights, privileges, duties and power during the period of possession:

    a. the duty of care, control, protection and reasonable discipline of the child;

    b. the duty to provide the child with clothing, food and shelter;

    c. the power to consent to medical and surgical treatment during an emergency involving immediate danger to the health and safety of the child.

The Court, having considered the circumstances of the parents, finds that SAMUEL FLOYD BONNER is obligated to support the children and is able to make child support payments and that payments of support would be in the best interest of the children.

IT IS THEREFORE ORDERED that SAMUEL FLOYD BONNER pay child support to LOIS JEAN BONNER in the amount of $88.50 per child per month with the first payment being due on the 30th day of October, 1975, and a like amount on each month thereafter until the child with respect to whom payments are made shall attain the age of eighteen.  Payments are to be made through the District Clerk's Office.

The Court finds that the parties have entered into an agreement for the division of their community property.  Both parties have asked the Court to approve the agreement, which the Court finds to be fair and reasonable.

IT IS THEREFORE ORDERED that the community property agreement entered into by Petitioner and Respondent and filed herein be and is hereby approved and incorporated into this Decree by reference.

The Court finds that it was necessary for Petitioner to secure the services of ROBERT GEISSLER, a licensed attorney, to preserve and protect Petitioner's rights in a divorce involving the parent-child relationship. The Court finds that a fee of $125.00 is reasonable and proper fee for the services rendered in the part of this action affecting the parent-child relationship.

IT IS THEREFORE ORDERED that ROBERT GEISSLER, a licensed attorney, by and is hereby awarded judgment in the amount of $125.00 for legal services rendered. The Judgment is awarded against SAMUEL FLOYD BONNER for which let exectuion issue if not timely paid.

All costs of court expended in this cause are hereby adjudged against Petitioner.

Execution shall issue for all of the above if not timely paid.

Signed and entered this 30TH day of September, 1975.

_____
JUDGE

APPROVED:

_____
Attorney for Petitioner

4.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LOIS JEAN CAGE | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. C-00-093 |
| | § | |
| MADELINE E. BONNER, | § | |
| THE ESTATE OF SAMUEL BONNER | § | |
| AND REYNOLDS METALS COMPANY | § | |

## ORDER GRANTING DEFENDANT REYNOLDS METALS COMPANY'S
## SECOND MOTION FOR SUMMARY JUDGMENT

On this day came before this Court Defendant Reynolds Metals Company's Second Motion

for Summary Judgment. The Court, having considered said motion, and the pleadings, exhibits,

affidavits and other papers on file herein, is of the opinion and finds that Defendant's motion is

meritorious and should be granted. It is therefore,

ORDERED, ADJUDGED and DECREED that Defendant Reynolds Metals Company's

Second Motion for Summary Judgment is in all things hereby granted and that Plaintiff's claims

against Defendant Reynolds Metals Company be dismissed in their entirety.

SIGNED this _____ day of _____, 2000.


_____
UNITED STATES DISTRICT JUDGE